Department of the Interior v. FERC Mr. Ludman, good morning. Good morning. May it please the Court, Robert Ludman representing the Department of the Interior. I'd like to reserve five minutes for rebuttal. Fine. Okay, this case is about the 19th century Pawtucket Dam in Lowell, Massachusetts. The dam provided the water that powered Lowell's textile mills and looms. The dam, canals, mills, and looms made Lowell the birthplace of the Industrial Revolution in the United States. In recognition of the historical importance of Lowell in the industrialization of this country, Congress created the Lowell National Historical Park, and that park preserves the history of the Industrial Revolution in Lowell and New England for future generations. Mr. Ludman, we're having to understand what the term adverse effect is. Right. And it seems to me one of the starting places we have is that both agencies agree that what happened pursuant to the 1983 order resulting in the 1985 installation of the fish ladder was not an adverse effect. Am I correct in understanding that? Right. The park and Interior did not argue that the 1983 fish ladder violated the Lowell Act. In fact, you've agreed, I read the reply brief, you agree that it was not an adverse effect that was prohibited by the Lowell Act. Right. So my question is, when we have both agencies agreeing that the installation of a new powerhouse, a new tailrace channel, a new transmission line, and then, as I understand it, essentially elimination or covering over of a hundred feet of dam is not under this statute an adverse effect, what is it that, what standard is being used to say that those sorts of changes are not an adverse effect that would mean that this proposed change is an adverse effect? Well, I think the answer is it's to the entire dam. It would replace the top of the dam. It's a lesser change to more feet of the dam. Well, I'd say compared to the fish ladder it's a comparable change to a hundred percent of the dam versus ten percent of the dam. And the fish ladder was, Interior believes, at the border of adverse effect. It was an effect and Interior decided that it didn't, in its opinion, rise the level of adverse effect of the Lowell Act. It's a pretty substantial effect that kind of seems to me to reject the sort of anything that's adversely impacting the historical preservation or design or character position. We're now into a position where you can do things that will in fact change in a modern way that could not have existed in the 1800s features of that dam, such as a modern fish ladder. And once we're off into that zone, why don't we then start running into the substantial evidence or deference to the administrative decision-making, not on their meaning of the law, but on their balancing that this type of change, just to an add-on feature of the dam, was not so much greater than the earlier change that your client agrees is not an adverse effect? Well, I think because the Act doesn't provide for that sort of balancing. We're talking about whether it's an adverse effect or not. It's not just an add-on to the dam. The flashboards have been there since the 1830s. We're talking 175 years of flashboards topping the dam. It is the system, the technology that existed during the Industrial Revolution. So it is the, it's the top of the dam, it's the most visible, it raises the height of the dam, and it collapses as designed when floodwaters come. So this is what Chief Engineer Francis put on the dam when he was in charge of the 1800s. And so it's not just the top of the dam, not important, it is a critical historical artifact for how the dam operated at the time. It was eliminated in the first hundred feet? It was, right, it's eliminated in the... What, what criteria, as we move along from a hundred feet to 200 feet to 300 feet to the whole dam just affecting flashboards, at what point, what criteria do we use to cut to an adverse impact? Well, that may be a harder case if we're talking 40% of the dam, for example. That would be a difficult, a more difficult issue of, have we reached adverse effect or not? We'd have to look at the context, history of the dam, etc. Here though, we don't have that. We have the whole thing. And so the dam would no longer function, would no longer appear, and its structure would no longer be similar to what it was back in the 19th century. And the... Finish, because I have a question. So the point, the point of the historical park, the reason Congress created this park is to protect that history. And it didn't create it in a huge geographic swath, it targeted a narrow area of Lowell. Then I'm gonna, before you keep on going, I want to know, when were the fish ladders first installed? Well, there are historical fish ladders going back to the 19th century, so... From the original dam? From the original dam. Chief Engineer Francis had a, you know, not modern, but a fish passage area in the same area in which the modern fishway was installed. And these, these ladders were modified or changed when? The modern fishway was installed in the 1980s. And how do they differ from the old ones? I don't have a picture in my head of what the old ones exactly look like. The modern one, there are, there are sites in the record and pictures of it. It is, it is concrete, it is, it is more modern, it's not... It was a more modern version of a historical item that was there before. Right. How does that differ from what's being done now? I think it differs in three ways. First way is, it's 10% of the dam. If you look at the whole dam, it's not covering up the entire dam. Second, the fishway and fish passage is not historically important the same way that the flashboards are. The flashboards... Why not? The flashboards are a whole system. The flashboards raised the height of the dam, increased the power that Lowell's waters generated, and this is what made Lowell the birthplace of the Industrial Revolution in the country. The mills, the looms, at the peak of the 19th, in the 19th century, were producing a mile of cloth every day, one yard wide. And that, more than a mile. So that... Who's responsible for the dam operating in a safe fashion? Your agency or the FERC? That's... That's FERC licenses dam safety. Well, they're claiming that the present... the present system may create floods and other safety issues. Am I correct that they're claiming that? They are claiming that. I think their claim is exaggerated. Here's what the record shows. Here's what FERC's order says. Exaggerated. Now, that leads me to Chevron deference. If they're in charge of the safety, why... why aren't they entitled to deference on that issue? Well, that's two... two issues, I think. Safety is one issue, and Chevron deference for the meaning of adverse effect in the Lowell Act is a separate issue. I don't... Well, if they're in charge of safety, and their opinion is that this is required to prevent floods, why isn't that entitled to Chevron deference? Well, Chevron deference as to the meaning of the Lowell Act, what adverse effect means, is not related to FERC's federal power authority and... and... and maintenance of safety. As to safety, I just want to get in two critical points here. If this was a safety issue, the order would not say, boot, it's up to you to decide whether to install this or not once you've done your financial analysis of whether to go forward. It would say, this is a safety issue, you must do it. And the order simply doesn't do it. It gives boot the option, explaining that depending on how much this costs, boot your... your... your choice on whether to install this or not. This wasn't triggered by the Dam Safety Inspection Program that FERC runs, and it's just not the safety issue on the... on the dam of that sort. Otherwise, presumably FERC wouldn't say, it's up to you. Second, as to flooding, I'll be very brief here, just as a factual matter, if you look at the FERC orders here, they say, and... and I'm... I'll quote, that with respect to, on page 16 of the addendum, 16 of the order, that there... the dam and the flashboards at most is a minor effect on flooding. And that's FERC's own words. So we're not talking here about a big flood control dam with big flood control capabilities. We're talking about a short dam that has some backwater effect that depends on whether the flashboards are up or down, or the fish ladder, because it's... it's what's causing me the most difficulties with your argument. I... I know... I mean, there are lots of people who would argue that the history of our country's relationship with the wildlife and natural resources is a really important part of our history, and the fish ladder and how industrializing America dealt with fish and getting up and down streams is a big part of the natural history of this country. And I could make that argument, seems to me, as equally strong as you can make it to how flashboards worked on top of a dam. And yet we know that your agency agreed that it's not an adverse effect to replace 100% of the fish ladder. The entire fish ladder got replaced with a modern fish ladder. So I'm having trouble understanding now why you... you would say it's so fundamentally different to replace the flashboards with a new modern version that does that same function, that it's so fundamentally different that we have to say the agency erred as a matter of law. That's what's causing the difficulty. I see your arguments fitting the fish ladder just as strongly as they fit the flashboards. I don't think they fit as strongly as the fish ladder, and I think we can look at a few different places to find out why. First, if you look at the Lowell Act, there's no mention of environmental protection. It's about protecting industrial history. And the fish ladder is not the same as the flashboards, but the flashboards have the clear link to raising the height of the water, increasing power, increasing the ability of the looms and mills to generate cloth. So that's the first place we look, is what the statute is trying to accomplish. The second place we can look is the National Register of Historic Places documents, the National Historical Landmark Places, and there's no mention of environmental protection, fishway protection, etc. It is focused on the role of the engineering of the dam, the engineering of Lowell, the canals, the water, the power, the textile industry of 19th century Lowell. Well, isn't this called the park? It's a historical park. Yes, and they were interested in the waterway. In fact, the waterway gets mentioned, and the dam itself doesn't, as I understand it, in the purpose clause of the statute. The fishway, the third point I want to make, the waterway is mentioned, the water power structure is mentioned, the engineering is mentioned. There's no mention of fish. Right, but there's no mention of flashboards, so that doesn't get you anywhere. Well, the National Historic Landmark documents, the National Historic Register documents describe the dam and its flashboards, and we've cited to that page in our brief. So the flashboards, and there's, the experts who have looked at this, the professors who have studied it, that none of them are pointing to, and the agencies, the expert agencies beyond Interior, the State Historic Preservation Office here, the National Trust for Historic Preservation, the Advisory Council, they all are perfectly clear that they think the flashboards are historically important. But Congress gave this decision to FERC. Congress gave the decision to FERC, but Congress imposed an obligation on FERC, no adverse effect on the historical resources of the dam. About that, Counsel, I'd like to go back to Judge Torea's point about the overall discretion that is given to FERC. This is a piece that I don't quite understand, and I hope you'll help me out. I don't really think the question necessarily stops at adverse effect. It's adverse effect to what? The way I read the Act, it's resources, not just resource. And why can't FERC take into account the other resources in the park? It seems like it has. Well, there's a couple responses to that. FERC's reading of the statute just takes out the resources of entirely. It would leave the language, adverse effect on the park or preservation district. And we think the better reading is the resources of is inserted in order to make clear that there are multiple resources in the park and preservation district, and what you need to look at as the baseline for impact is the resource that's being affected. Otherwise, you're left with what FERC claims is okay here, which is, well, there's something left to tell the story of industrialization. But beyond that, there's the upstream impact, the safety, the recreation. That's what I'm getting at. Mitigation is important, I think, but there are resources beyond the dam that they take into account. And I thought that was Judge Torea's point. Well, I guess I don't think they made this argument in their brief or their, especially their orders, where they don't focus on the resources of language. It's the resources of the park and preservation district, and the statute is clearly creating those two in order to protect historical resources. It's not protecting recreational resources. It's not a recreational park. It's not protecting environmental fish passageway. It's not a national wildlife refuge. It's a historical park. And so what we're talking about is historical impact on a resource. And I think when you look at the case through the lens of what the statute is trying to accomplish, what you can't permit is the replacement of the entire top of the dam with a fully modern steel concrete crest over 1,000 feet across the dam. And that's just a different impact than is allowed. We've had the statute for 35 years and never run into this before. You know, to date, with respect to the fishway, Interior has weighed it and said, we're not going to object. We're not going to make the argument or the law lack. That was close to the line. But this one is way beyond the line in our belief, and would have a significant impact on the dam. What do you say? Same sort of question, Judge Torea had. What about the FERC's finding that the flashboards over time were going to actually damage the capstone of the dam? Why don't we defer to that finding? They know more about dams than you do. You know, the damage to the capstones, that just doesn't answer the question whether there's an adverse effect on the law lack or not. And what we have is 175 years of history. The dam is still there. The capstones are still there. The flashboards are still there. What we don't have is a dam that's failing. We don't have FERC mandating anything. They're simply giving Booth the option. No, but they're saying that the effect of this is actually to preserve for a longer period of time the capstone of the dam itself. It's preserving the capstones by drilling giant steel holes through them, putting on a concrete crest on top, filling with concrete as necessary. And so it's not protecting the capstones, it's just changing them entirely. Thank you. Ms. Banta? Good morning. Good afternoon. I'm Carol Banta. Oh, it's morning. Oh, is it still morning? Yep. Sorry. I'm Carol Banta for the Federal Energy Regulatory Commission. I'll just begin with the very last point. Judge Chiata, you're right. The Commission did find that continuing the flashboards does require more and more drilling into the capstone. I do want to correct one, I believe, misstatement. The design for the proposed crest gate was, not your misstatement, Your Honor, but the design was changed several times over the course of this litigation, and the one that is at issue now that was in the rehearing order, the capstones would not be covered with concrete. That was an earlier proposal that was removed in one of the later things. So anchors would be drilled into the capstones just as the poles for the flashboards have repeatedly, and there are pictures in the record of the damage to the capstones, but the capstones will not be covered in concrete as one earlier iteration of the proposal included. What do you think of Mr. Ledman's argument that whatever it is that's being done, the drilling that's being done is at least as substantial or more so than leaving the flashboards in place? In other words, he's questioning FERC's judgment on that. What do you point us to in the record to reject that factual assertion? Well, I may not have a site handy for that, but the Commission did say that, did address that there would just be steel anchors drilled into the masonry through the capstones just as the pins have been. I think the order did mention that the concrete had been removed, I mean, not removed, the proposal, it had been removed from the proposal. That is, I'm sure at least in the rehearing order, I know the Commission mentioned it as that avoiding the initial prospect of there having been concrete on the capstones. And the Commission said that the capstones would still be visible from downstream when the crest gates are up, just as they are now with the flashboards. They wouldn't be visible from upstream, but usually you can't see anything from upstream because the water is covering up above the granite. I want to make a point about the fish ladder. The Commission did draw heavily on its previous experience in the 1983 order. It cited it in paragraphs 82, 83, 102, and 133 in its first order, paragraph 27 of its second order, and making the point that there was an alteration to the actual masonry of the dam with this fish ladder, there was no question about that. And that initial adverse effect was not removed, but it was satisfactorily mitigated by interpretive exhibits, visitor facilities illustrating the difference between historic and modern generation, and by documentation of the dam as it was before the modifications, which is something that the historic preservation statutes account for as a measure, documentation. Just some pictures that the Court can look at later. There's a drawing of where the fish ladder is relative to the dam at 1495 of the appendix. There's an aerial picture at 1532, and there's a close-up picture at 195 that really shows that it is a modern steel and concrete fish ladder that doesn't in any way resemble the rudimentary fish ladder that had really just an opening in the dam that had existed previously. So the Commission looked at what happened with the 1983 experience and said there was a clear change to the masonry of the dam, and yet everyone was okay with that, with the mitigative measures. And the Lowell Act, of course, was in effect in 1983. So although the Commission in that order, I think because it wasn't litigated, didn't break out its discussion of the Historic Preservation Act versus the Lowell Act provisions the way it did extensively in these orders. Since you mentioned pictures, can I just ask one question? In your brief you have a before and after picture. Right. The after is an artist's rendition, right? Yes, and it is a rendition before some of the later changes. You really can't see from that picture that there would have been concrete over the capstones, but it wouldn't look exactly like this because it was actually changed to make it less intrusive. I know there was a question mark at the end of my sentence, but that's not really the question. The question is, these things are pneumatic, so they're inflatable? Okay. That drawing, is that while they're inflated or not inflated? I believe that that's while they're upright, yes. That's certainly my understanding of what that picture is supposed to represent, what it would look like from the downstream view. Because most of the time they're expected to be inflated. That's right. There are spring floods in April or May. I believe the record showed in your average year, I think in 2009, the flashboards were washed out five times in 2009. So there would be certain occasions in the year where the crest gate would be completely lower, and all you see then is the picture of the waterfall that is somewhere in the record as well, that would look exactly the same. And then much of the rest of the year from upstream, all the recreational boating and such, you don't see very much because the impoundment stays above the granite on the dam. And the downstream, I think the view tends to be from a distance, except maybe right from that one observation deck. So the commission did find that there would be a change to the appearance. It didn't agree with this assertion that there would be a change in the function. The dam with its crest control structure still dams up the Merrimack and puts water into the canals that powered the mills of Lowell. And the commission looked, going to Your Honor's question about resources, the commission did look at the Lowell Act determination with regard to resources. The resources of the park and all of the evidence in the record about the significance of the dam. And there is no evidence in this record of the flashboards in particular, except one reference that they existed. But all of the evidence from the Keeper of the National Register and from the nomination forms was that the dam is a significant part of this system. Its significance is its association with the canals and the mills of Lowell. And so the commission did look at it that way. I would go in particular to rehearing Order Paragraph 22 and the original Order Paragraph 96, where the commission talked about how this change would not have an adverse effect on the dam in its role within the context or would not also have an adverse effect on the resources collectively of the park. Yes, but to be fair, when I was asking opposing counsel about that, I was talking about recreation and other upstream effects, flooding and that sort of thing. And those really weren't taken into account, I take it, in terms of adverse effect on resources. You were limiting resources to historical resources. That's right. Because the way the commission did it, and you really see it in the first order, as it must under the Federal Power Act, it considered all the various things in the Federal Power Act that it's required to consider. And that has always included historical resources. I would refer to the Scenic Hudson case from 1965 that historic preservation has always been considered by the courts and the agency to be within its responsibilities as to recreational opportunities and such. But this goes right to, correct me if I'm wrong, it goes right to its point, though, that that is to say if any balancing is to be done, it's in and among the historical resources. And FERC really shouldn't be considering those other things that it suggested that it was going to balance and did balance. So isn't that a tension point here that we have to deal with? No, that's actually what I was about to explain. In the first order, there are a number of sections in the amendment order, and they're not all just about the Lowell Act. They're also about the Section 106 and 110F obligations under the NHCPA. So a lot of the discussion in the amendment order about balance is in those sections, but the Lowell Act itself is considered separately beginning with paragraphs 125 through 148. That's where the commission looks separately, just at the Lowell Act, and there's no balancing against other things in that section. It looks at the Lowell Act on its own terms. It doesn't say, well, there's an adverse effect, but we balance it against everything else, and it's okay. That's not how it treated the Lowell Act. It did, of course, allow other concerns, including the flooding, to inform its analysis as far as the other sections of the NHCPA, and I had to go through that to understand that myself because there was a lot of discussion in the amendment order about balancing, but not in the section that deals specifically with the Lowell Act. The key holding in the first order with regard to the Lowell Act, I think, well, there are a couple places. It does, in paragraph 89, even though that is dealing with all of the NHCPA considerations together, it says the dam's historic and engineering significance stems not from its particular means of crest control, but from its association with the locks, canals, and mills. And then when it gets to look at the Lowell Act in particular, it talks about whether there's an adverse effect on its ability to convey that role or play its part in Lowell Park. I want to make one quick mention. Okay, that's five minutes. I want to mention the Neighborhood Association of Back Bay case, which is cited in several of the briefs, and I think is particularly informative on this because it talks about the, there it's the Federal Transit Administration, being charged under the statute, I think it was under 110F, with making the adverse effect determination, and the courts defer to that because in that case there were parties saying you're the Federal Transit Administration, you don't get deference for this, and this court specifically disagreed and said that the statute leaves it to whatever agency is doing the licensing to make that determination, and that will be informed, of course, by the policy imperatives such as the Federal Power Act and the other considerations. But as I said, in the order itself, the commission did not balance something against the effect with regard to the Lowell Act. Can I ask this? If this is as it stands now, you know, an on-off switch, it's either the flash boards as they are now or it's this, whatever it is, crest what? It's a crest gate. Crest gate. Crest gate. Does that mean the next time the flash boards are destroyed from the excess water, they just put up plywood again? For now, yes. Yeah, I mean that has been, that is what they're continuing to do now because the crest gate has not yet been installed. And as I said, the record that was mentioned in 2009, which was not one of those 100-year flood years, but just in 2009, that was done five times. And it's just men on boats. Can you go through the history of the flash boards? I mean, they were not there originally, then they were, and when did they become plywood? I don't think we have in the record when they became plywood. There was some rumbling about that before the agency in this proceeding, and I think the commission said, or the staff said at one point, the license in 1983 didn't make any specifications for what it had to be. I know there were no flash boards and they were one foot, two foot, three foot, five foot. They used to be wrought iron pins and then they were steel pins. And so the materials have varied over the years. And again, it may not be clear from this record, but flash boards are actually a pretty common, so are crest gates as well. Crest control structure used on not just this kind of granite dam, but other kinds of dams as well. Certainly in New England, but I've seen some references to them on the West Coast as well. And some of them in areas where I think the flooding in the impoundment areas is more of a concern, and the modern, you know, the more preferred technology is the crest gate, as has been done downstream on the Essex Dam in Lawrence. And there's material in the record about how successful that's been there. I think unless the court has any further questions, I'll cede the rest of my time. Thank you. Thank you. Lorenzo, good morning. Good morning. May it please the Court, Richard Lorenzo for the intervener, Booth Hydropower and the Trust. Your Honor, you asked, Judge Howard, you asked about the flash boards. From 1826 to 1838, there were no flash boards. Starting in 1838, there were two foot flash boards, which were wrought iron and wooden planks. There were three foot flash boards starting in 1833, and the five foot flash boards started in 1876. And there's a picture of workmen installing the flash boards from the 1920s in the joint appendix at 1468. And that shows they're still using wooden planks at that time in installing. And it also shows how inherently dangerous the work of installing the planks were. I'm sure Osher would be really pleased to see those workers sitting in the little boats and hanging off the side of the dam trying to put these large pins into the granite concrete and install the planks to them. I think Judge Kayette had the correct question when he asked how is an adverse effect determined and who determines it. And it's an iterative process. It's not just that it created, oh, this has or has not an adverse effect. The way it is done practically at FERC or through the procedure is initially you determine we're going to take some action, and that may have an adverse effect on our historic property. And then you look to whether you can avoid, minimize, or mitigate the adverse effect. This is concerned in the regulations under the National Historic Properties Act, 36 CF Code of Federal Regulations at 806. And that's exactly what FERC did in 1983. That's exactly what FERC did today. It starts off and says, yes, you're going to take some action. It could have an adverse effect. What can we do to avoid, minimize, or mitigate? And mitigate is the key here because in 1983 they mitigated it through certain informational exhibits, just as they're going to do here, just as is proposed here. They mitigated it in making, but they couldn't mitigate the size of the fishways because it's a massive concrete structure, just tons of concrete poured over the granite dam in order to make the step structure so the fish can go up. In another instance, which is in the record and discussed briefly in our brief, is the destruction of the University Avenue Bridge. And this shows the process exactly. The University Avenue Bridge was built in 1895, and this is in the record at 1331 to about 1333. And it's a memorandum of understanding between the National Park Service, the Lowell Park, and the National Highway Administration. And they're going to take down a bridge, put up a new bridge, destroy several houses, historic houses in the meantime in order to put the bridge in. They make the initial finding, this will be an adverse effect. And then they mitigate it by designing a contextual, sensitive new bridge to be over the Merrimack River, and also some archival photographs. So what you have is an adverse effect determination, and then the mitigation measures that would be used to minimize the adverse effect and alleviate it so that you can make the no adverse effect finding. Where in the language of the statute do you point us to that would say it's okay to have an adverse effect as long as you mitigate it in some way? It is neither in this statute nor in the National Historic Preservation Act statute, but it's detailed in the regs implementing the National Historic Preservation Act statute, the regs that Council for Interior points us to for a definition of adverse effect. And that has two steps, 805 and 806. 805 details what an adverse effect may be, and 806 details how you avoid, mitigate, or minimize an adverse effect in order to have the no adverse effect ruling. So if Congress in adapting the term adverse effect from the National Historic Preservation Act statute would have adapted those regulations or the interpretation of those regulations allowing minimization or mitigation. In the NHPA there is no flat prohibition on having adverse effects. There is no flat prohibition on having adverse effects. In this statute it says you don't have an adverse effect. And that's the difference between the two statutes. The licensing agency, in this case FERC, has to make a second determination in this case that there is no adverse effect through avoidance, mitigation, or minimization, which it doesn't have to make under the other statute. Thank you. Thank you for your well-argued case. Do you have some time left? I do. I reserve five minutes. That's fine. I forgot about that. Okay. Well, I'm happy to be back. History of flashboards. I just want to clarify a couple points. First year was 1833. Then 1838 and on every year. So they're longstanding. So if this statute had been passed in 1833, you would have at that time maintained no flashboards could be put on the stand. Well, there was no industrial revolution yet. We were at the outset. So I don't think Congress would have jumped in quite yet. Second, to the extent there was a question from Judge Howard about the use of plywood, FERC's order, addendum page 46, says that the current structure is equivalent to the historical structure, the current structure being the flashboard systems with plywood steel pins. So there's no question here. Interior thinks it could be better. But there's no question here that if FERC has an order, that it's not equivalent of what's been there historically. And we ruled that you get the boards that look more historic. No, I'm just. We have not. We have not claimed that. What we're worried about is the steel crest. As to the amount of concrete on it, we don't know. The first design was concrete across the whole thing. Currently what we have is a conceptual design with a picture that shows steel pins going through, more steel pins, and some concrete who knows how much. So it may be less concrete than they first proposed putting across the whole top of the capstones, but it's not no concrete. It's somewhere in the middle, and we don't know the answer yet to that. But we think it's too much. As to the fish ladder, one point I did not make is the fish ladder is on the far side from the critical historical resources of the park. The gatehouse that let the water into the canal, the gatekeeper's home, the blacksmith home, they're all on the south side of the river. The fish ladder is on the far side, so the visual impact from that is lessened compared to the visual impact from the flashboards, which covers the whole dam. As Council for FERC agreed, it mentioned the commission acknowledged a change in appearance here of the dam and that that would be, according to commission staff, an adverse effect. Now they get around that by saying, don't worry, there's mitigation. But the mitigation here is brown. We're going to paint the thing brown, and second, we're going to put black straps on it. And third, we're going to put an exhibit showing you what used to be there. But the point of a historical park is not to ensure color coding that's consistent or to have exhibits that show what used to be there. The point of the historical park is to preserve what is there now that reflects what was there in the 1800s. But nobody's out standing next to the flashboards, right? The Park Service has tours, boat tours, where they show people the dam and the flashboards. How close? Well, it depends on the water, but they get close enough to see it. The bridge that Council for BOOT mentioned has an overlook where you can see the dam and the flashboards. So people are looking at the flashboards. So they'll see something fundamentally different than certainly when they approach it closely. Right. Not even particularly closely. You can see them from the gatekeeper's side, from the gatehouse. The only time you can't see them is when the whole thing is overtopped with water, in which case both the crest gate and the flashboards would be underwater during a high-flow flood event. As to function, FERC says there's no change in function, but that just ignores the flashboards. FERC gets there by saying the flashboards are not part of the dam. And they are part of the dam. They function differently than the crest gate. And the function of the flashboards has been the same now since the 1830s, regardless of whether they're one, two, or five feet. And they were five feet by late in the 19th century. So the five-feet height has been around for a long time as well. As to balancing, I do think FERC in its brief orders argues repeatedly. The only argument we've made here is the Lowell Act. In response, there's a lot of argument from FERC about how they should be able to balance their way out of it. The Lowell Act gives FERC a different task with respect to this narrow geographic area, which is no adverse effect on the resources of the park and to comply with the standards. So for all those reasons, we think here that the change that FERC has authorized would be substantial, significant, have a negative impact on the historical resources of the park, especially the historic dam. And unless the Court has any other questions, we ask that you vacate FERC's orders. Thank you.